**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CARL BRYAN,
            *Plaintiff-Appellee,*

v.

BRIAN MACPHERSON; CORONADO
POLICE DEPARTMENT; CITY OF
CORONADO, a municipal
corporation,
            *Defendants-Appellants.*

No. 08-55622

D.C. No.
3:06-CV-01487-
LAB-CAB

OPINION

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued and Submitted
October 9, 2009—Pasadena, California

Filed June 18, 2010

Before: Harry Pregerson, Stephen Reinhardt and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Wardlaw

---

**COUNSEL**

Steven E. Boehmer, David Stotland, Carrie L. Mitchell of McDougal, Love, Eckis, Smith, Boehmer & Foley, El Cajon, California, for the appellant.

Eugene G. Iredale, Julia Yoo of Law Offices of Eugene G. Iredale, San Diego, California, for the appellee.

---

**OPINION**

WARDLAW, Circuit Judge:

Early one morning in the summer of 2005, Officer Brian MacPherson deployed his taser against Carl Bryan during a traffic stop for a seatbelt infraction. Bryan filed this action under 42 U.S.C. § 1983, asserting excessive force in violation of the Fourth Amendment. Officer MacPherson appeals the denial of his motion for summary judgment based on qualified immunity. We affirm the district court in part because, viewing the circumstances in the light most favorable to Bryan, Officer MacPherson's use of the taser was unconstitutionally excessive. However, we reverse in part because the violation of Bryan's constitutional rights was not clearly

established at the time that Officer MacPherson fired his taser at Bryan on July 24, 2005.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Carl Bryan's California Sunday was off to a bad start. The twenty-one year old, having stayed the night with his younger brother and some cousins in Camarillo, which is in Ventura County, planned to drive his brother back to his parents' home in Coronado, which is in San Diego County. However, Bryan's cousin's girlfriend had accidently taken Bryan's keys to Los Angeles the previous day. Wearing the t-shirt and boxer shorts in which he had slept, Bryan rose early, traveled east with his cousins to Los Angeles, picked up his keys and returned to Camarillo to get his car and brother. He then began driving south towards his parents' home. While traveling on the 405 highway, Bryan and his brother were stopped by a California Highway Patrolman who issued Bryan a speeding ticket. This upset him greatly. He began crying and moping, ultimately removing his t-shirt to wipe his face. Continuing south without further incident, the two finally crossed the Coronado Bridge at about seven-thirty in the morning.

At that point, an already bad morning for Bryan took a turn for the worse. Bryan was stopped at an intersection when Officer MacPherson, who was stationed there to enforce seatbelt regulations, stepped in front of his car and signaled to Bryan that he was not to proceed. Bryan immediately realized that he had mistakenly failed to buckle his seatbelt after his earlier encounter with the police. Officer MacPherson approached the passenger window and asked Bryan whether he knew why he had been stopped. Bryan, knowing full well why and becoming increasingly angry at himself, simply stared straight ahead. Officer MacPherson requested that Bryan turn down his radio and pull over to the curb. Bryan complied with both requests, but as he pulled his car to the curb, angry with himself over the prospects of another citation, he hit his steering wheel and yelled expletives to himself.

Having pulled his car over and placed it in park, Bryan stepped out of his car.

There is no dispute that Bryan was agitated, standing outside his car, yelling gibberish and hitting his thighs, clad only in his boxer shorts and tennis shoes. It is also undisputed that Bryan did not verbally threaten Officer MacPherson and, according to Officer MacPherson, was standing twenty to twenty-five feet away and not attempting to flee. Officer Mac-Pherson testified that he told Bryan to remain in the car, while Bryan testified that he did not hear Officer MacPherson tell him to do so. The one material dispute concerns whether Bryan made any movement toward the officer. Officer Mac-Pherson testified that Bryan took "one step" toward him, but Bryan says he did not take any step, and the physical evidence indicates that Bryan was actually facing away from Officer MacPherson. Without giving any warning, Officer MacPherson shot Bryan with his taser gun. One of the taser probes embedded in the side of Bryan's upper left arm. The electrical current immobilized him whereupon he fell face first into the ground, fracturing four teeth and suffering facial contusions. Bryan's morning ended with his arrest[1] and yet another drive —this time by ambulance and to a hospital for treatment.

Bryan sued Officer MacPherson and the Coronado Police Department, its police chief, and the City of Coronado for excessive force in violation of 42 U.S.C. § 1983, assault and battery, intentional infliction of emotional distress, a violation of California Civil Code § 52.1, as well as failure to train and related causes of action. On summary judgment, the district court granted relief to the City of Coronado and Coronado Police Department, but determined that Officer MacPherson was not entitled to qualified immunity at this stage of the pro-

---

[1]Bryan was charged with resisting and opposing an officer in the performance of his duties in violation of California Penal Code § 148. Bryan was tried on this violation, but following a hung jury, the state dismissed the charges.

ceedings. The court concluded that a reasonable jury could find that Bryan "presented no immediate danger to [Officer MacPherson] and no use of force was necessary." In particular, it found that a reasonable jury could find that Bryan was located between fifteen to twenty-five feet from Officer Mac-Pherson and was not facing him or advancing toward him. The court also found that a reasonable officer would have known that the use of the taser would cause pain and, as Bryan was standing on asphalt, that a resulting fall could cause injury. Under the circumstances, the district court concluded it would have been clear to a reasonable officer that shooting Bryan with the taser was unlawful.

## II.   STANDARD OF REVIEW

The district court's denial of qualified immunity is reviewed de novo. *Blanford v. Sacramento County*, 406 F.3d 1110, 1114 (9th Cir. 2005). Where disputed issues of material fact exist, we assume the version of the material facts asserted by the non-moving party. *See KRL v. Estate of Moore*, 512 F.3d 1184, 1188-89 (9th Cir. 2008). All reasonable inferences must be drawn in favor of the non-moving party. *John v. City of El Monte*, 515 F.3d 936, 941 (9th Cir. 2008).

## III.   DISCUSSION

**[1]** In evaluating the denial of a police officer's assertion of qualified immunity, we ask two distinct questions. First, we must determine whether, taking the facts in the light most favorable to the non-moving party, the officer's conduct violated a constitutional right; and second, if a violation occurred, whether the right was "clearly established in light of the specific context of the case." *al-Kidd v. Ashcroft*, 580 F.3d 949, 964 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). We may "exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

### A. Did Officer MacPherson Employ Constitutionally Excessive Force?

**[2]** Allegations of excessive force are examined under the Fourth Amendment's prohibition on unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001). We ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 397. We must balance " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)); *see also Scott v. Harris*, 550 U.S. 372, 383 (2007). Stated another way, we must "balance the amount of force applied against the need for that force." *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003).

### 1. Nature and Quality of the Intrusion

We begin by analyzing the quantum of force—the type and amount of force—that Officer MacPherson used against Bryan.[2] *See Deorle*, 272 F.3d at 1279; *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994). Officer MacPherson shot Bryan with a Taser X26 provided by the Coronado Police Department. The X26 uses compressed nitrogen to propel a pair of "probes"—aluminum darts tipped with stainless steel barbs connected to the X26 by insulated wires—toward the target at a rate of over 160 feet per second. Upon striking a person,[3] the X26 delivers a 1200 volt, low ampere electrical charge through the

---

[2]Although the taser used by Officer MacPherson was the X26 model, our holding applies to the use of all controlled electric devices that cause similar physiological effects.

[3]According to the manufacturer, the probes do not need to penetrate the skin of the intended target to result in a successful connection. The probes are capable of delivering their electrical charge through up to two inches of clothing. Here, Bryan was shirtless when confronted by Officer MacPherson. As a result, one probe penetrated his skin.

wires and probes and into his muscles.[4] The impact is as powerful as it is swift. The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless. *See Draper v. Reynolds*, 369 F.3d 1270, 1273 n.3 (11th Cir. 2004); *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993). The tasered person also experiences an excruciating pain that radiates throughout the body. *See Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009) ("[O]ne need not have personally endured a taser jolt to know the pain that must accompany it . . . ."); *Hickey*, 12 F.3d at 757.

[3] Bryan vividly testified to experiencing both paralysis and intense pain throughout his body when he was tasered. In addition, Officer MacPherson's use of the X26 physically injured Bryan. As a result of the taser, Bryan lost muscular control and fell, uncontrolled, face first into the pavement. This fall shattered four of his front teeth and caused facial abrasions and swelling. Additionally, a barbed probe lodged in his flesh, requiring hospitalization so that a doctor could remove the probe with a scalpel. A reasonable police officer with Officer MacPherson's training on the X26 would have foreseen these physical injuries when confronting a shirtless individual standing on asphalt. We have held that force can be unreasonable even without physical blows or injuries. *See, e.g.*, *Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000), *vacated and remanded on other grounds* 534 U.S. 801 (2001);[5] *Tekle v. United States*, 511

---

[4]Tasers have been described as delivering a 50,000 volt charge. *See, e.g.*, *Brown v. City of Golden Valley*, 574 F.3d 491, 495 n.3 (8th Cir. 2009). While technically accurate, this does not entirely describe the electrical impulse encountered by a taser victim. According to the manufacturer, this 50,000 volt charge is needed to ensure that the electrical current can "jump" through the air or victim's clothing, thus completing a circuit. The manufacturer maintains, however, that the full 50,000 volts do not enter the victim's body; rather, it represents that the X26 delivers a peak voltage of 1,200 volts into the body.

[5]On remand from the Supreme Court in light of its then-recent opinion in *Saucier*, the *Headwaters* panel reaffirmed its earlier excessive force analysis. *See Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002).

F.3d 839, 845 (9th Cir. 2007). The presence of non-minor physical injuries like those suffered by Bryan, however, is certainly relevant in evaluating the degree of the Fourth Amendment intrusion.

**[4]** We, along with our sister circuits, have held that tasers and stun guns fall into the category of non-lethal force.[6] *See, e.g.*, *Lewis*, 581 F.3d at 476; *United States v. Fore*, 507 F.3d 412, 413 (6th Cir. 2007); *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 969 n.8 (9th Cir. 2005).[7] Non-lethal, however, is not synonymous with non-excessive; all force—lethal and non-lethal—must be justified by the need for the specific level of force employed. *Graham*, 490 U.S. at 395; *see also Deorle*, 272 F.3d at 1285 ("Less than deadly force, like deadly force, may not be used without sufficient reason; rather, it is subject to the *Graham* balancing test."). Nor is "non-lethal" a monolithic category of force. A blast of pepper spray and blows from a baton are not necessarily constitutionally equivalent levels of force simply because both are classified as non-lethal. Rather than relying on broad characterizations, we must evaluate the nature of the specific force employed in a specific factual situation. *See Chew*, 27 F.3d at 1441 (stating that the *Graham* factors "are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure.").

The physiological effects, the high levels of pain, and foreseeable risk of physical injury lead us to conclude that the X26 and similar devices are a greater intrusion than other non-lethal methods of force we have confronted. In *Headwaters*, we held that a jury could conclude that pepper spray was

---

[6]"Lethal force" is force that creates a substantial risk of death or serious bodily injury. *See Smith v. City of Hemet*, 394 F.3d 689, 705-07 (9th Cir. 2005) (en banc).

[7]We recognize, however, that like any generally non-lethal force, the taser is capable of being employed in a manner to cause the victim's death. *See, e.g.*, *Oliver v. Fiorino*, 586 F.3d 898, 906 (11th Cir. 2009).

more than a "minimal intrusion" as it caused "intense pain . . . , an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx." 240 F.3d at 1200. We rejected the district court's characterization of pepper spray's intrusiveness as "merely the infliction of transient pain without significant risk of physical injury." *Id.* at 1199. We similarly reject any contention that, because the taser results only in the "temporary" infliction of pain, it constitutes a non-intrusive level of force. The pain is intense, is felt throughout the body, and is administered by effectively commandeering the victim's muscles and nerves. Beyond the experience of pain, tasers result in "immobilization, disorientation, loss of balance, and weakness," even after the electrical current has ended. *Matta-Ballesteros v. Henman*, 896 F.2d 255, 256 n.2 (7th Cir. 1990); *see also Beaver v. City of Federal Way*, 507 F. Supp. 2d 1137, 1144 (W.D. Wash. 2007) ("[A]fter being tased, a suspect may be dazed, disoriented, and experience vertigo."). Moreover, tasering a person may result in serious injuries when intense pain and loss of muscle control cause a sudden and uncontrolled fall.

[5] The X26 thus intrudes upon the victim's physiological functions and physical integrity in a way that other non-lethal uses of force do not. While pepper spray causes an intense pain and acts upon the target's physiology, the effects of the X26 are not limited to the target's eyes or respiratory system. Unlike the police "nonchakus" we evaluated in *Forrester v. City of San Diego*, 25 F.3d 804 (9th Cir. 1994), the pain delivered by the X26 is far more intense and is not localized, external, gradual, or within the victim's control. *Id.* at 807, 805 n.5. In light of these facts, we agree with the Fourth and Eighth Circuit's characterization of a taser shot as a "painful and frightening blow." *Orem v. Rephann*, 523 F.3d 442, 448 (4th Cir. 2008) (quoting *Hickey*, 12 F.3d at 757). We therefore conclude that tasers like the X26 constitute an "intermediate or medium, though not insignificant, quantum of force," *Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1168 (E.D. Cal. 2008); *Beaver*, 507 F. Supp. 2d at 1144 ("[T]he Court

first finds that the use of a Taser constituted significant force.").

**[6]** We recognize the important role controlled electric devices like the Taser X26 can play in law enforcement. The ability to defuse a dangerous situation from a distance can obviate the need for more severe, or even deadly, force and thus can help protect police officers, bystanders, and suspects alike. We hold only that the X26 and similar devices constitute an intermediate, significant level of force that must be justified by " 'a strong government interest [that] *compels* the employment of such force.' " *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003) (quoting *Deorle*, 272 F.3d at 1280 (9th Cir. 2001)).

2. Governmental Interest in the Use of Force

**[7]** Under *Graham v. Connor*, we evaluate the government's interest in the use of force by examining three core factors, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396; *see also Deorle*, 272 F.3d at 1280. These factors, however, are not exclusive. Rather, we examine the totality of the circumstances and consider "whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994). This analysis allows us to "determine objectively 'the amount of force that is necessary in a particular situation.' " *Deorle*, 272 F.3d at 1280 (quoting *Graham*, 490 U.S. at 396-97). Viewing the facts in the light most favorable to Bryan, the totality of the circumstances here did not justify the deployment of the Taser X26.

**[8]** The "most important" factor under *Graham* is whether the suspect posed an "immediate threat to the safety of the officers or others." *Smith v. City of Hemet*, 394 F.3d 689, 702

(9th Cir. 2005) (en banc) (quoting *Chew*, 27 F.3d at 1441). "A simple statement by an officer that he fears for his safety or the safety others is not enough; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281. The district court correctly concluded that Bryan's volatile, erratic conduct could lead an officer to be wary. While Bryan's behavior created something of an unusual situation, this does not, by itself, justify the use of significant force. "A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Id.* Rather, the objective facts must indicate that the suspect poses an immediate threat to the officer or a member of the public.

**[9]** We agree with the district court that Bryan did not pose an immediate threat to Officer MacPherson or bystanders despite his unusual behavior. It is undisputed that Bryan was unarmed, and, as Bryan was only dressed in tennis shoes and boxer shorts, it should have been apparent that he was unarmed. *Cf. id.* at 1281 ("Deorle was wearing no shirt or shoes, only a pair of cut-off jeans shorts. There was nowhere for him to secrete any weapons."). Although Bryan had shouted expletives to himself while pulling his car over and had taken to shouting gibberish, and more expletives, outside his car, at no point did he level a physical or verbal threat against Officer MacPherson. *See Smith*, 394 F.3d at 702-03 (recognizing that although the victim was shouting expletives, there was no threat leveled against the officer). Bryan was standing, without advancing, fifteen to twenty-five feet away from Officer MacPherson between the door and body of the car. We reject Officer MacPherson's contention that Bryan constituted a threat by taking a step in Officer MacPherson's direction. First, when explicitly asked if he "[took] a step out of the car" or a "step out away from the car," Bryan testified "no." There is, therefore, a genuine issue of fact on this point, one that, on this procedural posture, we must resolve in Bryan's favor and conclude that Bryan did not advance

towards the officer.[8] Second, even if Bryan had taken a single step toward Officer MacPherson, this would not have rendered him an immediate threat justifying an intermediate level of force, as he still would have been roughly nineteen to twenty-four feet away from Officer MacPherson, by the officer's own estimate.

[10] Not only was Bryan standing, unarmed, at a distance of fifteen to twenty-five feet, but the physical evidence demonstrates that Bryan was not even facing Officer MacPherson when he was shot: One of the taser probes lodged in the side of Bryan's arm, rather than in his chest, and the location of the blood on the pavement indicates that he fell away from the officer, rather than towards him.[9] An unarmed, stationary individual, facing away from an officer at a distance of fifteen to twenty-five feet is far from an "immediate threat" to that officer. Nor was Bryan's erratic, but nonviolent, behavior a potential threat to anyone else, as there is no indication that there were pedestrians nearby or traffic on the street at the time of the incident.[10] Finally, while confronting Bryan, Officer MacPherson had unholstered and charged his X26, plac-

---

[8]Counsel for Officer MacPherson argued that there is no genuine issue regarding whether Bryan took a step towards Officer MacPherson on the basis of Bryan's response to the question of "Did you move your feet in any way?" Bryan answered, "I don't think so." There are, however, any number of ways one can move one's feet without taking a "step." Because Bryan specifically denied taking a step when expressly asked, we find a genuine issue exists as to this fact.

[9]Officer MacPherson's deposition testimony only bolsters this conclusion. He testified that Bryan fell "faced forward" onto the pavement while Bryan similarly testified that he fell straight forward.

[10]Officer MacPherson testified in his deposition that the intersection where he tasered Bryan does not have a lot of traffic on it early on Sunday mornings and that he did not remember the presence of any traffic on the specific morning in question. Other than Bryan, his younger brother, and Officer MacPherson, the record indicates that the only individuals near the scene were an individual playing tennis nearby and a jogger located across the street. Their declarations indicate that they were fifty to seventy-five feet and forty feet away, respectively.

ing him in a position to respond immediately to any change in the circumstances. The circumstances here show that Officer MacPherson was confronted by, at most, a disturbed and upset young man, not an immediately threatening one.

Officer MacPherson relies heavily on the Eleventh Circuit opinion in *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004), which addressed the use of a taser during the arrest of an aggressive, argumentative individual. Although we do not adopt *Draper* as the law of this circuit, the present case is clearly distinguishable from the one before the Eleventh Circuit. Unlike Bryan, who was yelling gibberish and gave no sign of hearing or understanding Officer MacPherson's orders, it was undisputed in *Draper* that Draper heard and understood the officer's commands, and not only failed to comply, but engaged the officer in an increasingly heated argument. *Id.* at 1273. Four times the officer asked Draper to retrieve paperwork from the cab of his truck and four times Draper heard the officer, turned toward the truck to comply, but then turned around, walked back toward the officer and loudly accused the officer of "harassing" and "disrespecting" him, displaying a growing belligerence. *Id.* It was not until the fifth time that the officer requested the paperwork and Draper refused to comply, yelled at the officer, and paced toward him in agitation that the officer resorted to the taser. *Id.* The Eleventh Circuit determined that a verbal arrest command (when Draper had refused to comply with the first five commands) accompanied by an attempt to physically handcuff Draper "in these particular circumstances, may well have or would likely have escalated a tense and difficult situation into a serious physical struggle, in which either Draper or [the officer] would be seriously hurt." *Id.* at 1278.

Bryan never addressed, let alone argued with, Officer MacPherson once he left his car. In addition, whereas Bryan remained stationary at a distance of approximately twenty feet, or at most took a single step forward, Draper was located close to the officer and pacing in an agitated fashion while

arguing with him. Id. Thus, the officer in *Draper* was confronting a belligerent, argumentative individual who was angrily pacing within feet of his position. Officer MacPherson, by contrast, was confronted with a half naked, unarmed, stationary, apparently disturbed individual shouting gibberish at a distance of approximately twenty feet. The only similarity to the factual circumstances in *Draper* is that both Draper and Bryan were stopped for a traffic violation, were loud, and were tasered by the police.

**[11]** The severity of Bryan's purported offenses "provide[ ] little, if any, basis for [Officer MacPherson's] use of physical force." *Smith*, 394 F.3d at 702. It is undisputed that Bryan's initial "crime" was a mere traffic infraction—failing to wear a seatbelt—punishable by a fine. Traffic violations generally will not support the use of a significant level of force. *See Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) ("Deville was stopped for a minor traffic violation . . . making the need for force substantially lower than if she had been suspected of a serious crime."). Officer MacPherson also claims that he reasonably believed Bryan had committed three misdemeanors—resisting a police officer, failure to comply with a lawful order, and using or being under the influence of any controlled substance[11]— and that these constitute "serious—and dangerous—criminal activity." We disagree with Officer MacPherson's assessment. While "the commission of a misdemeanor offense is 'not to be taken lightly,' it militates against finding the force used to effect an arrest reasonable where the suspect was also nonviolent and 'posed no threat to the safety of the officers or others.' " *Headwaters*, 240 F.3d at 1204 (quoting *Hammer v. Gross*, 932 F.2d 842, 846 (9th

---

[11]Cal. Veh. Code § 2800(a) (making it a misdemeanor to willfully fail or refuse to comply with an order of a peace officer); Cal. Health & Safety Code § 11550 (making it unlawful to "use, or be under the influence of any controlled substance"); Cal. Penal Code § 148 (punishing every individual "who willfully resists, delays, or obstructs any public officer . . . in the discharge . . . of his or her office" with a fine up to $1000 or up to 1 year in a county jail).

Cir. 1991)). None of the offenses for which Bryan was cited or of which he was suspected is inherently dangerous or violent, and as already discussed, Bryan posed little to no safety threat. *Cf. Parker v. Gerrish*, 547 F.3d 1, 9 (1st Cir. 2008) ("Though driving while intoxicated is a serious offense, it does not present a risk of danger to the arresting officer that is presented when an officer confronts a suspect engaged in an offense like robbery or assault."). Therefore, there was no substantial government interest in using significant force to effect Bryan's arrest for these misdemeanor violations that even the State of California has determined are minor.[12] *Cf. Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003) (finding a felony to be "by definition a crime deemed serious by the state").

[12] Officer MacPherson now argues that use of the taser was justified because he believed Bryan may have been mentally ill and thus subject to detention. To the contrary: if Officer MacPherson believed Bryan was mentally disturbed he should have made greater effort to take control of the situation through less intrusive means. As we have held, "[t]he problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." *Deorle*, 272 F.3d at 1282-83. Although we have refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals, we have found that even "when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue

---

[12]Our sister circuits have likewise concluded that misdemeanors are relatively minor and will generally not support the deployment of significant force. *See, e.g.*, *Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008); *Reese v. Herbert*, 527 F.3d 1253, 1274 (11th Cir. 2008). In addition, we have previously suggested that felonies not involving violence provide limited support for the use of significant force under *Graham*. *See Meredith*, 342 F.3d at 1063; *Chew*, 27 F.3d at 1442-43 & n.9.

him, the governmental interest in using such force is diminished by the fact that the officers are confronted . . . with a mentally ill individual." *Id.* at 1283. The same reasoning applies to intermediate levels of force. A mentally ill individual is in need of a doctor, not a jail cell, and in the usual case —where such an individual is neither a threat to himself nor to anyone else—the government's interest in deploying force to detain him is not as substantial as its interest in deploying that force to apprehend a dangerous criminal. Moreover, the purpose of detaining a mentally ill individual is not to punish him, but to help him. The government has an important interest in providing assistance to a person in need of psychiatric care; thus, the use of force that may be justified by that interest necessarily differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community. Thus, whether Officer MacPherson believed that Bryan had committed a variety of nonviolent misdemeanors or that Bryan was mentally ill, this *Graham* factor does not support the deployment of an intermediate level of force.

Turning to Bryan's "resistance," we note that Bryan in fact complied with every command issued by Officer MacPherson except the one he asserts he did not hear—to remain in the car. Even if Bryan failed to comply with the command to remain in his vehicle, such noncompliance does not constitute "active resistance" supporting a substantial use of force. Following the Supreme Court's instruction in *Graham*, we have drawn a distinction between passive and active resistance. *See Forrester*, 25 F.3d at 805 (finding that protestor's "remaining seated, refusing to move, and refusing to bear weight" despite police orders to the contrary constituted "passive resistance"); *see also Headwaters*, 276 F.3d at 1130-31 (finding that protestors, who were chained together with devices and refused to exit a building when ordered, passively resisted).

By shouting gibberish and hitting himself in the quadriceps, Bryan may not have been perfectly passive. "Resistance,"

however, should not be understood as a binary state, with resistance being either completely passive or active. Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer. We must eschew ultimately unhelpful blanket labels and evaluate the nature of any resistance in light of the actual facts of the case. For example, in *Smith v. City of Hemet*, we confronted an individual who "continually ignored" officer commands to remove his hands from his pockets and to not re-enter his home. In addition, he "physically resisted . . . for only a brief time." 394 F.3d at 703. Although Smith was not perfectly passive in the encounter, we stated that it did not appear "that Smith's resistance was particularly bellicose" and thus found that this factor provided little support for a use of significant force. *Id.* Even purely passive resistance can support the use of some force, but the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance.

[13] Reviewing Bryan's conduct, we conclude that even if we were to consider his degree of compliance solely from the officer's subjective point of view, this case would be closer to the passive resistance we confronted in *Forrester* and *Headwaters* or the minor resistance in *Smith*, than it would be to truly active resistance. The only resistance Officer Mac-Pherson testified to was a failure to comply with his order that Bryan remain in his car. Shouting gibberish and hitting one's quadriceps is certainly bizarre behavior, but such behavior is a far cry from actively struggling with an officer attempting to restrain and arrest an individual. *Compare Abdullahi v. City of Madison*, 423 F.3d 763, 776 (7th Cir. 2005) (involving an arrestee swinging a belt at an officer and "strenuously resist[-ing]" as the police attempted to handcuff him); *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1241-42 (11th Cir. 2003) (involving an arrestee engaging and advancing on officers with a stick); *Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001) (involving an individual interfering with an attempted arrest of an individual by engaging the offi-

cer in a "melee"). As in *Smith*, Bryan's "resistance" was not "particularly bellicose." *Smith*, 394 F.3d at 703. Indeed, when we view the facts in the light most favorable to Bryan, as we must at this stage of the proceedings, his conduct does not constitute resistance at all.[13]

**[14]** Two additional considerations militate against finding Officer MacPherson's use of force reasonable. First, it is undisputed that Officer MacPherson failed to warn Bryan that he would be shot with the X26 if he did not comply with the order to remain in his car.[14] We recognized in *Deorle* that police officers normally provide such warnings where feasible, even when the force is less than deadly, and that the failure to give such a warning is a factor to consider. *See* 272 F.3d at 1284; *see also Jackson*, 268 F.3d at 653 (finding that the officer's "safety interest" "increased further when the group was warned by police that a chemical irritant would be used if they did not move back . . . and the group refused to comply"). Here, it was feasible to give a warning that the use of force was imminent if Bryan did not comply. While a warning to Bryan may or may not have caused him to comply, there was "ample time to give that order or warning and no reason whatsoever not to do so." *Deorle*, 272 F.3d at 1284.

**[15]** Second, we have held that police are "required to consider '[w]hat other tactics if any were available' to effect the arrest." *Headwaters*, 240 F.3d at 1204 (quoting *Chew*, 27 F.3d

---

[13]The jury may credit Bryan's testimony that he did not hear the officer's order to remain in the car. The evidence suggests that Bryan thought the officer would again approach from the passenger side of his car and that Bryan turned to face that way. That the officer was instead yards away in the other direction may have prevented Bryan from hearing the commands.

[14]Officer MacPherson now argues that he did warn Bryan. However, Officer MacPherson's own testimony belies this claim. Officer MacPherson has consistently testified that he repeatedly ordered Bryan to remain in his vehicle. This clearly constitutes a command, but it hardly warns him that if he failed to return to his car he would be shot with a taser.

at 1443).[15] Officer MacPherson argues that there were no less intrusive alternatives available to apprehend Bryan. Objectively, however, there were clear, reasonable, and less intrusive alternatives. Officer MacPherson knew additional officers were en route to the scene. He was, or should have been, aware that the arrival of those officers would change the tactical calculus confronting him, likely opening up additional ways to resolve the situation without the need for an intermediate level of force. Thus, while by no means dispositive, that Officer MacPherson did not provide a warning before deploying the X26 and apparently did not consider less intrusive means of effecting Bryan's arrest factor significantly into our *Graham* analysis.

### 3.   Balancing the Competing Interests

**[16]** Our review of the *Graham* factors reveals that the government had, at best, a minimal interest in the use of force against Bryan. This interest is insufficient to justify the use of an intermediate level of force against an individual. We are cognizant of the Supreme Court's command to evaluate an officer's actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. We also recognize the reality that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. This does not mean, however, that a Fourth Amendment violation will be found only in those rare instances where an officer and his attorney are unable to find a sufficient number of compelling adjectives to

---

[15]We do not challenge the settled principle that police officers need not employ the "least intrusive" degree of force possible. *See Gregory v. County of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008) (citing *Forrester*, 25 F.3d at 807-08). We merely recognize the equally settled principle that officers must *consider* less intrusive methods of effecting the arrest and that the presence of feasible alternatives is a *factor* to include in our analysis.

describe the victim's conduct. Nor does it mean that we can base our analysis on what officers actually felt or believed during an incident. Rather, we must ask if the officers' conduct is " 'objectively reasonable' in light of the facts and circumstances confronting them" without regard for an officer's subjective intentions. *Id.*

**[17]** We thus conclude that the intermediate level of force employed by Officer MacPherson against Bryan was excessive in light of the governmental interests at stake. Bryan never attempted to flee. He was clearly unarmed and was standing, without advancing in any direction, next to his vehicle. Officer MacPherson was standing approximately twenty feet away observing Bryan's stationary, bizarre tantrum with his X26 drawn and charged. Consequently, the objective facts reveal a tense, but static, situation with Officer MacPherson ready to respond to any developments while awaiting backup. Bryan was neither a flight risk, a dangerous felon, nor an immediate threat. Therefore, there was simply "no immediate need to subdue [Bryan]" before Officer MacPherson's fellow officers arrived or less-invasive means were attempted. Deorle, 272 F.3d at 1282; *see also*, *Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007) (" '[I]t is the need for force which is at the heart of the *Graham* factors' " (quoting *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997))). Officer MacPherson's desire to quickly and decisively end an unusual and tense situation is understandable. His chosen method for doing so violated Bryan's constitutional right to be free from excessive force.

### B. Did Officer MacPherson Violate Bryan's Clearly Established Rights?

**[18]** Having concluded that Officer MacPherson's actions violated Bryan's Fourth Amendment rights, we next must ask whether his conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982). If an officer's use of force was "premised on a *reasonable* belief that such force was lawful," the officer will be granted immunity from suit, notwithstanding the fact excessive force was deployed. *Deorle*, 272 F.3d at 1285; *see also Saucier*, 533 U.S. at 202 (asserting that the qualified immunity analysis asks "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted"). We must, therefore, turn to the state of the law at the time Officer MacPherson tasered Bryan to determine whether Officer MacPherson reasonably could have believed his use of the taser against Bryan was constitutional. *See Saucier*, 533 U.S. at 202.

**[19]** All of the factors articulated in *Graham*—along with our recent applications of *Graham* in *Deorle* and *Headwaters* —placed Officer MacPherson on fair notice that an intermediate level of force was unjustified. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) ("Considering that under Fogarty's version of events each of the *Graham* factors lines up in his favor, this case is not so close that our precedents would fail to portend the constitutional unreasonableness of defendants' alleged actions."); *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004) (asking whether "a reasonable officer would have had fair notice that the force employed was unlawful"). Officer MacPherson stopped Bryan for the most minor of offenses. There was no reasonable basis to conclude that Bryan was armed. He was twenty feet away and did not physically confront the officer. The facts suggest that Bryan was not even facing Officer MacPherson when he was shot. A reasonable officer in these circumstances would have known that it was unreasonable to deploy intermediate force.

**[20]** We do not need to find closely analogous case law to show that a right is clearly established. *Moreno v. Baca*, 431 F.3d 633, 641 (9th Cir. 2005); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual

circumstances.""); *Oliver*, 586 F.3d at 907 (finding that a right can be clearly established where the officer's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case law"). However, as of July 24, 2005, there was no Supreme Court decision or decision of our court addressing whether the use of a taser, such as the Taser X26, in dart mode constituted an intermediate level of force. Indeed, before that date, the only statement we had made regarding tasers in a published opinion was that they were among the "variety of non-lethal 'pain compliance' weapons used by police forces." *San Jose Charter of Hells Angels Motorcycle Club*, 402 F.3d at 969 n.8. And, as the Eighth Circuit has noted, "[t]he Taser is a relatively new implement of force, and case law related to the Taser is developing." *Brown v. City of Golden Valley*, 574 F.3d 491, 498 n.5 (8th Cir. 2009). Two other panels have recently, in cases involving different circumstances, concluded that the law regarding tasers is not sufficiently clearly established to warrant denying officers qualified immunity. *Mattos v. Agarano*, 590 F.3d 1082, 1089-90 (9th Cir. 2010); *Brooks v. City of Seattle*, 599 F.3d 1018, 1031 n.18 (9th Cir. 2010).

**[21]** Based on these recent statements regarding the use of tasers, and the dearth of prior authority, we must conclude that a reasonable officer in Officer MacPherson's position could have made a reasonable mistake of law regarding the constitutionality of the taser use in the circumstances Officer MacPherson confronted in July 2005. Accordingly, Officer MacPherson is entitled to qualified immunity. *See Ctr. for Bio-Ethical Reform v. Los Angeles County Sheriff Dept.*, 533 F.3d 780, 794 (9th Cir. 2008).

## CONCLUSION

Viewing the facts, as we must, in the light most favorable to Bryan, we conclude, for the purposes of summary judg-

ment, that Officer MacPherson used unconstitutionally excessive force. However, a reasonable officer confronting the circumstances faced by Officer MacPherson on July 24, 2005, could have made a reasonable mistake of law in believing the use of the taser was reasonable. Accordingly we **REVERSE** the district court's denial of summary judgment on the basis of qualified immunity.

**REVERSED.**