# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 28, 2013

No. 12-30527

Lyle W. Cayce
Clerk

LATRINA D. THOMAS, Tutrix, on behalf of Ka'Dary Da'Shun Thomas,

Plaintiff–Appellee,

v.

SCOTT NUGENT, individually and in his official capacity as police officer for the City of Winnfield,

Defendant–Appellant.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 1:08-CV-1167

Before JOLLY, GARZA, and OWEN, Circuit Judges.

PER CURIAM:[*]

Latrina D. Thomas brought suit on behalf of her minor son seeking damages for the death of her son's father, Baron Pikes. The district court denied Officer Scott Nugent's assertion of qualified immunity as to Thomas's excessive force claim. We reverse and remand for dismissal of the claims against Nugent.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-30527

**I**

Thomas contends that Officer Nugent used excessive force when Pikes was tased eight times on the evening that Nugent and another officer, Cargyle Branch, arrested Pikes. An active felony warrant for Pikes's arrest was outstanding when Officer Nugent spotted Pikes as he was walking along a sidewalk. Nugent called for backup. He had prior dealings with Pikes and considered him a flight risk. Officer Branch arrived in a separate vehicle, and when Branch stepped out and tried to speak to Pikes, Pikes ran. The ensuing foot chase lasted approximately three minutes and ended when Officer Branch pointed his firearm at Pikes and ordered him to the ground. Pikes complied, and the officers handcuffed him. Pikes was breathing heavily.

The officers then directed Pikes, who was six feet tall and weighed 247 pounds, to stand up, but he refused to comply. A witness at a nearby business heard Pikes say, "oh, ya'll just drag me, take me, carry me." This witness heard the officers repeatedly ask Pikes to get up and walk, and when Pikes did not accede, the officers said that they would count to three, then tase him. They counted to three, and when Pikes did not arise, they again asked him to get up and walk and told him that they would count to three again, which they did. After counting to three a second time and yelling "taser, taser" without movement on Pikes's part, they then tased Pikes in "drive stun" mode in the middle of Pikes's back. This mode of delivery is utilized as a compliance procedure because it causes temporary and localized pain, as opposed to "probe mode," which results in incapacitation.

The officers contend that Pikes rolled away from the first administration of the taser in stun mode and that the taser device then deployed "at point blank range." Thomas contends that the probes pierced Pikes's flesh and that he received a "probe mode" shock, though Thomas concedes that all taser shocks except for this one were in drive stun mode. We accept Thomas's version of the

2

No. 12-30527

facts as true.[1]  Pikes then got up and walked about ten feet before falling to his knees.  Nugent gave another verbal warning and administered another drive stun (the second stun) to the middle of Pikes's back.  Nugent told Pikes that if he did not get up, Nugent would tase him again.  Pikes did not comply, and Nugent tased Pikes a third time in drive stun mode.  Nugent and Branch then tried to lift Pikes, but he refused to get up and told the officers that he would not go with them.  After ordering Pikes to get up several more times, and issuing another verbal warning, Nugent tased Pikes for a fourth time in drive stun mode.

Pikes then stood up and walked as far as a concrete barrier but stopped at that barrier and laid across it, asking the officers to leave him there so that he could die.  The officers ordered him to get up so that they could get him into a law enforcement vehicle and, after warning him, tased him a fifth time in drive stun mode.  He did not comply, and the officers repeated this sequence, stunning Pikes a sixth time in drive stun mode.  At that point, Pikes said that he would go, the officers helped him up, and he walked until he came to a parking lot, at which point he fell down.  Pikes asked for help to get up, the officers assisted him, and he was placed into Officer Branch's vehicle.  Approximately twelve minutes had expired since Pikes was handcuffed.

During the drive to the police department, Pikes told Branch, "I'm dead anyway, I'm dead anyway."  Upon arrival at the police department, Pikes would not exit the vehicle, saying that he "wanted to stay in the car so he could die."  Nugent performed a spark test on the stun gun device thinking that it might

---

[1] *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013) (citing *Haggerty v. Tex. S. Univ.,* 391 F.3d 653, 655 (5th Cir.2004) ("In an interlocutory appeal in which the defendant asserts qualified immunity, to the extent that the district court found that genuine factual disputes exist, we accept the plaintiff's version of the facts (to the extent reflected by proper summary judgment evidence) as true.")).
.

motivate Pikes. When Pikes did not exit, Nugent warned him that he would tase him and did so, in drive stun mode, to Pikes's upper right chest, by his shoulder. While being tased (for the seventh time), Pikes said that he would get out, and Nugent stopped the shock after two seconds rather than allowing the device to complete an automatic five second cycle.

Nugent helped Pikes out of the vehicle, and Pikes dropped to the ground. Nugent asked Pikes to get up and Pikes responded that he would not. Nugent again warned him and then administered another, the eighth and last, shock in drive stun mode to the middle of Pikes's back.

Pikes did not respond, and Nugent and another officer picked him up and "had to drag him" into the police department building. They placed him in a chair, but Pikes fell off the chair more than once. When Nugent asked Pikes what drugs he had taken, Pikes said that he had taken PCP and crack, but subsequent analysis showed only marijuana in his system. Pikes was "breathing kind of heavy," and Nugent immediately requested an ambulance.

Paramedics arrived and found Pikes on the floor, unresponsive. After being administered a sternum rub, Pikes regained consciousness and mumbled a few words. Paramedics attached heart monitor leads, but Pikes stopped breathing while the paramedics were placing blood pressure cuffs on him. Paramedics began resuscitation efforts and continued them as Nugent drove the ambulance to the hospital. Pikes was "flat lining" at this point. After treatment at the hospital for about an hour, Pikes was pronounced dead. An autopsy revealed that Pikes's red blood cells had sickled before his death. The officers did not know that Pikes had sickle cell anemia. However, the cause of Pikes's death is not at issue.

Thomas sued Officer Nugent, alleging that he violated Pikes's constitutional rights under the Fourth and Fourteenth Amendments by using excessive force and because he was deliberately indifferent to Pikes's need for

medical attention. Officer Nugent moved for summary judgment on the ground of qualified immunity. Although the district court granted the motion as to the deliberate indifference claim, it denied summary judgment as to excessive force. Officer Nugent now appeals this denial of summary judgment.

## II

"The denial of a motion for summary judgment based on qualified immunity is immediately appealable under the collateral order doctrine 'to the extent that it turns on an issue of law.'"[2] This means that when "the district court finds that genuinely disputed, material fact issues preclude a qualified immunity determination, this court can review only their materiality, not their genuineness."[3] "Whether there are material issues of fact is reviewed *de novo*."[4]

## III

"The doctrine of qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions if the official's acts were objectively reasonable in light of then clearly established law."[5] This privilege "is an *immunity from suit* rather than a mere defense to liability;" accordingly, "it is effectively lost if a case is erroneously permitted to go to trial."[6]

---

[2] *Flores v. City of Palacios*, 381 F.3d 391, 393 (5th Cir. 2004) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).

[3] *Manis v. Lawson*, 585 F.3d 839, 842 (5th Cir. 2009); *see also White v. Balderama*, 153 F.3d 237, 240 (5th Cir. 1998) (per curiam) ("[W]e possess jurisdiction to hear an interlocutory appeal challenging the materiality of the fact issues that led the district court to deny summary judgment but . . . we lack jurisdiction to hear interlocutory appeals challenging the genuineness of those fact issues.").

[4] *Manis*, 585 F.3d at 843.

[5] *Thompson v. Upshur Cnty., TX*, 245 F.3d 447, 456 (5th Cir. 2001).

[6] *Mitchell*, 472 U.S. at 526.

No. 12-30527

The qualified immunity defense has two prongs: (1) whether an official's conduct violated the plaintiff's clearly established constitutional rights, and (2) whether the government official's conduct was objectively reasonable in light of clearly established law.[7]  Once a defendant pleads qualified immunity, the plaintiff has the burden to rebut this defense by establishing genuine issues of fact as to both prongs.[8]  The plaintiff must offer more than "mere allegations" in order to negate the defense of qualified immunity.[9]  "A court may rely on either prong of the defense in its analysis" and may conduct its inquiry in any sequence.[10]

We consider only the second prong of the qualified immunity analysis because it resolves this appeal.  Thomas did not raise a material dispute as to whether Officer Nugent's actions were objectively reasonable in light of clearly established law.

The "clearly established" standard "does not mean that officials' conduct is protected by qualified immunity unless 'the very action in question has previously been held unlawful.'"[11]  But neither does an official lose qualified immunity "merely because a certain right is clearly established in the abstract."[12]  In other words, the fact that the abstract right to be free from excessive force is clearly established does not categorically negate qualified immunity.  "Otherwise, '[p]laintiffs would be able to convert the rule of qualified

---

[7] *Thompson*, 245 F.3d at 457.

[8] *See, e.g.*, *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

[9] *Manis*, 585 F.3d at 843 (internal quotation marks omitted).

[10] *Brown*, 623 F.3d at 253 (citing *Manis*, 585 F.3d at 843); *see also Pearson v. Callahan*, 555 U.S. 223, 242 (2009).

[11] *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

[12] *Id.*

immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."[13]    The "central concept" is "fair warning,"[14] which means that an officer is entitled to qualified immunity unless "all but the plainly incompetent or those who knowingly violate the law" would have known that the conduct at issue violated constitutional rights.[15]

Thomas relies on *Bryan v. McPherson*[16] and *Newman v. Guedry*[17] to show that Officer Nugent's use of force was unreasonable.  *Bryan* and *Newman*, however, are distinguishable from the circumstances of this case.  In *Bryan*, the Ninth Circuit described the impact of a taser as paralyzing the muscles throughout the body and causing excruciating pain.[18]  In light of that holding, Thomas asserts that Officer Nugent's repeated tasering was "grossly disproportionate to the nature of the threat."  However, in *Bryan* the officer had stopped a driver for failing to wear a seatbelt and while the driver, Bryan, was standing beside his vehicle, the officer aimed the taser device at Bryan's bare chest in probe mode and, without any warning, tasered Bryan when he took "one step" toward the officer.[19]  One of the metal probes lodged in Bryan's arm, and

---

[13] *Manis*, 585 F.3d at 846 n.4 (5th Cir. 2009) (quoting *Anderson*, 483 U.S. at 639).

[14] *Kinney*, 367 F.3d at 350 (internal quotation marks omitted).

[15] *Manis*, 585 F.3d at 845 (internal quotation marks omitted); *see also Thompson v. Upshur Cnty., TX*, 245 F.3d 447, 460 (5th Cir. 2001) ("[W]hen the defendant moves for summary judgment based on qualified immunity, it is the plaintiff's burden to demonstrate that all reasonable officials similarly situated would have then known that the alleged acts of the defendants violated the United States Constitution.").

[16] 590 F.3d 767 (9th Cir. 2009), *withdrawn and superseded*, 608 F.3d 614 (9th Cir. 2010), *withdrawn and superseded*, 630 F.3d 805 (9th Cir. 2010).

[17] 703 F.3d 757 (5th Cir. 2012).

[18] *Bryan*, 590 F.3d at 772-73.

[19] *Bryan*, 590 F.3d at 771.

it had to be surgically removed.[20]  The electrical current delivered during the tasing paralyzed Bryan and caused him to fall face-first onto pavement.[21]  Four of his teeth were broken as a result.[22]  In the present case, there is no indication that Nugent intended for the taser device to discharge in probe mode.  Moreover, Pikes thereafter failed to comply with the officers' numerous requests to get up and walk with them to the police vehicle.  The Ninth Circuit's decision in *Bryan* does not clearly establish that tasering Pikes under the circumstances of this case would constitute excessive force.  With regard to tasering in drive stun mode, the Ninth Circuit, in *Brooks v. City of Seattle*,[23] granted qualified immunity in part because unlike probe mode,[24] drive stun mode caused only temporary, localized pain and was authorized by the Seattle Police Department's use of force guidelines as a compliance mechanism.[25]  Likewise here, Officer Nugent testified that the Winnfield City Police Department authorized taser use in drive stun mode in the face of passive resistance.[26]

In *Newman*, we considered an excessive force claim against an officer who had repeatedly tasered the plaintiff.[27]  The officer asserted he had no reasonable

---

[20] *Id*. at 773.

[21] *Id*.

[22] *Id*.

[23] 599 F.3d 1018 (9th Cir. 2010), *aff'd on reh'g sub nom. Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (en banc).  The final iteration of *Bryan* acknowledges this distinction as well.  630 F.3d 805, 820 (9th Cir. 2010).

[24] Referred to as "dart mode" by the Ninth Circuit.

[25] *Brooks*, 599 F.3d at 1026.

[26] *See Gutierrez v. City of San Antonio*, 139 F.3d 441, 448-49 (5th Cir. 1998) (noting that a memo reminding officers of the prohibition of a particular police practice was material to assessing the objective reasonableness of the officer's conduct).

[27] *Newman v. Guedry*, 703 F.3d 757, 760 (5th Cir. 2012).

No. 12-30527

warning that tasering a suspect multiple times was a constitutional violation because "there was then no binding caselaw on the appropriate use of tasers."[28] Although we agreed with the officer, we held also that "in an obvious case, the *Graham* excessive-force factors themselves can clearly establish the answer, even without a body of relevant case law."[29] These factors aid in assessing the reasonableness of the force used by considering (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) whether he is actively resisting arrest or attempting to evade arrest by flight."[30]

Thomas asserts that just as in *Newman*, the *Graham* excessive-force factors clearly establish the answer in this case such that a body of relevant case law is unnecessary. But as with *Bryan*, *Newman* is also distinguishable from the facts of this case. In *Newman*, the suspect had committed no crime, posed no threat to anyone's safety, and did not resist the officers or fail to comply with a command.[31] In fact, the plaintiff claimed he was tasered repeatedly despite never being given any command by the officers.[32] The facts in another recent decision of this court, *Ramirez v. Martinez*,[33] are somewhat similar to those in *Newman*.[34] In contrast, Pikes was arrested pursuant to an active felony warrant, attempted to evade arrest, was subdued only through the threat of deadly force, and did not comply with the officers' repeated requests to cooperate

---

[28] *Id.* at 763.

[29] *Id.* at 764 (internal quotation marks omitted).

[30] *Graham v. Connor*, 490 U.S. 386, 396 (1989).

[31] *Newman*, 703 F.3d at 764.

[32] *Id.* at 763.

[33] 716 F.3d 369 (5th Cir. 2013).

[34] *Ramirez*, 716 F.3d at 378.

in effectuating the arrest.  Thus, this case does not provide an "obvious" example of excessive force such that Thomas satisfied her burden to demonstrate that Officer Nugent's use of force was unreasonable under clearly established law.[35]

Because *Bryan* and *Newman* are distinguishable from the circumstances in this case, Thomas has presented no law to support the unreasonableness of Officer Nugent's actions.  Thomas has not met her burden to show that Officer Nugent's use of force was unreasonable such that qualified immunity would not apply.[36]

*    *    *

For the foregoing reasons, we REVERSE the district court's denial of summary judgment and REMAND for dismissal of Thomas's claims against Officer Nugent.

---

[35] *See Poole v. City of Shreveport*, 691 F.3d 624, 625-26, 629 (5th Cir. 2012) (holding that police officer's use of force and tasering the plaintiff during an arrest was not objectively excessive or clearly unreasonable when the plaintiff resisted arrest and did not comply with requests).  Essentially the only evidence in the record about the reasonableness or unreasonableness of the force applied comes from the arresting and jail officers.  Consequently, although there were numerous tasings, which certainly raises suspicion as to the excessiveness of force, none of the evidence shows that the tasings were an unreasonable response under the circumstances reflected in the record before us.

[36] *See Sama v. Hannigan*, 669 F.3d 585, 591 (5th Cir. 2012) (citing *Kovacic v. Villarreal*, 628 F.3d 209, 211-12 (5th Cir. 2010)) ("Once raised, the burden shifts to the plaintiff . . . .").