Opinion by Judge TASHIMA; Dissent by Judge CLIFTON.
OPINION
TASHIMA, Circuit Judge:
After a night of drinking with her friends, Sara Lowry returned to her workplace and fell asleep on her office couch. She awoke a short while later and went to the bathroom, before returning to- her couch and going back to sleep.- Unfortunately for- Lowry, during her trip to the bathroom, she accidentally triggered the building’s burglar alarm. Several .officers from the San Diego Police Department (“SDPD”) responded, accompanied by a police service dog named Bak. After searching the area and . giving several warnings, the officers released Bak into Lowry’s, office. Bak found Lowry and pounced on her, tearing open her upper lip.
Lowry filed suit against the City of San Diego (the “City”) under 42 U.S.C; § 1983, alleging that the City’s policy of training its police dogs to “bite and hold” individuals resulted in a violation of her Fourth Amendment rights. The district court granted the City’s motion for summary judgment, concluding both that Lowry did not suffer constitutional harm and that, even if she did, the City was not liable for her injuries.
We- have jurisdiction under -28 U.S.C. § 1291. The question on this appeal is whether a reasonable jury could find that the police officers responding to the alarm used excessive force when they deliberately unleashed a police dog that they knew might well “rip[ ] [the] face off’ any individual who might be present in the office. Because a reasonable jury could find that the force used was excessive and because the City concedes that the use of the force involved was in conformance with its policy, we reverse and remand the case for further proceedings.
I.
In early 2010, Lowry was working at Tenzing Corporation, located at 4603 Mission Boulevard, Suite 201,- in San Diego, California; On the night of February 11, 2010, Lowry went out with a few friends after work. Over the course of about four and a half hours, Lowry visited two bars and consumed five vodka drinks. Lowry decided to call it a night at-around 9:30 p.m., but, instead of heading home, made a pit stop at work to pick up some food she had left over from lunch. Once there, *845 Lowry decided to stay in the office, and fell asleep on the couch.
Shortly thereafter, Lowry woke up and went to use the bathroom. Acting on instinct, Lowry headed towards the bathroom in the neighboring suite (owned by a separate company, Drew George & Partners or “DGP”), the bathroom she typically used during business hours. After opening the door to DGP, Lowry decided against using their bathroom, concluding that “it wouldn’t be right for [her] to use that restroom at night.” She closed the door, went to a bathroom outside both suites, that was open to the public and then returned to her office and fell back asleep qn the couch. . ..
Around 11:00 p.m., the SDPD received a call from ADT Security Services that a burglar alarm had been activated at 4603 Mission Boulevard, Suite 200.' Minutes later, Officers Mike Fish and David Zelenka and Sergeant Bill Nulton arrived at the scene, accompanied by Sergeant Nulton’s police service dog, Bak. The officers inspected the'north, south,'and west sides of the building' and saw no entry points. However, each officer saw that the door leading to Suite 201 was propped open.[1] There were no signs of forced entry at Suite 201, which was dark, except for some ambient light shining through the open door from the parking lot.[2] The officers could not see inside the suite, and therefore did not:know whether, anyone was inside.
Before entering Suite -201, Sergeant Nulton yelled loudly, “This is the San Diego Police Department! Come out now or I’m sending, in a police dog! You may be bitten!” Sergeant Nulton waited between 30 and 60 seconds, but received no response, He repeated the same warning once or twice more; again, there was no response.[3] Lowry did not hear these *846 warnings. Sergeant Nulton then released Bak “off lead” (that is, off of her leash) into the suite, and followed Bak in. Sergeant Nulton did not keep track of Bak’s precise location once he let her off lead, and gave no further warnings after entering the suite.
Eventually, Sergeant Nulton made his way into the office where Lowry was sleeping. Once there, he saw a purse whose contents had been spilled across the floor. He then shone his flashlight against the office wall and spotted a person under a blanket on the couch. At that moment, Bak jumped on top of Lowry. The two struggled momentarily before Sergeant Nulton called Bak off. Bak responded immediately, returning to Sergeant Nul-ton’s side.
Lowry emerged from her skirmish with Bak with a large gash on her lip that was bleeding profusely. As hospital staff would later inform Lowry, Bak had almost completely bitten through her lip. Shortly after the incident, Sergeant Nulton told Lowry, “I just can’t believe that’s the only damage. You’re very lucky. She could have ripped your face off.” After confirming that Lowry worked at Tenzing, Officer Fish drove her to the hospital, where she was given a tetanus shot and received three stitches.
The SDPD trains its police dogs to enter a building, find a person, bite them, and hold that bite until a police officer arrives and removes the dog. Moreover, as Sergeant Nulton stated in his deposition, police dogs are not trained to differentiate between “a young child asleep or ... a burglar standing in the kitchen with a butcher knife,” and will simply bite the first person they find. Generally, the decision of whether to conduct a canine search on or off lead is left to the officer’s discretion. However, the SDPD’s Canine Unit Operations Manual provides that residential searches “should normally be conducted on-lead unless the handler can reasonably determine there are no residents or animals in the home.”
Lowry filed suit against the City under 42 U.S.C. § 1988, alleging a violation of her Fourth Amendment rights. The City moved for summary judgment, which the district court granted. Lowry timely appealed.
II.
We review a district court’s grant of summary judgment de novo. Pac. Shores Props., LLC v. City of Newport Beach, 730 F.3d 1142, 1156 (9th Cir.2013). “We must determine, viewing the evidence in the light most favorable to [Lowry], the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law.” Olsen v. Idaho State Bd. of Med., 363 F.3d 916, 922 (9th Cir.2004). In the absence of material factual disputes, the objective reasonableness of a police officer’s conduct is “a pure question of law.” Torres v. City of Madera, 648 F.3d 1119, 1123 (9th Cir.2011) (quoting Scott v. Harris, 550 U.S. 372, 381 n. 8, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)). “Where the objective reasonableness of an officer’s conduct turns on dis puted issues of material fact,” however, “it is ‘a question of fact best resolved by a jury.’” Id. at 1123 (quoting Wilkins v. City of Oakland, 350 F.3d 949, 955 (9th Cir.2003)).
III.
Lowry asserts a single cause of action against the City, seeking to hold the municipality liable for her injuries under Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Specifically, Lowry alleges that the City’s “bite and hold” policy caused the police to use *847 excessive force against her. In order to prevail on a Monell claim, Lowry “must demonstrate first that h[er] seizure by [Bak] was unconstitutional and second that the city was responsible for that constitutional wrong.” Chew v. Gates, 27 F.3d 1432, 1439 (9th Cir.1994).
A. Excessive Force
We begin our analysis of Lowry’s Monell claim by assessing whether Bak’s seizure of Lowry was unconstitutional. Objectively unreasonable uses of force violate the Fourth Amendment’s guarantee against unreasonable seizures. Graham v. Connor, 490 U.S. 386, 394-95, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In deciding whether or not a particular use of force is reasonable, we employ the familiar test set forth by the Supreme Court in Graham. Under Graham, we balance “the nature and quality of the intrusion on the individual’s Fourth Amendment interests against the countervailing governmental interests at stake.” Id. at 396, 109 S.Ct. 1865 (citations omitted). This inquiry is .a “highly fact-intensive task for which there are no per se rules.” Torres, 648 F.3d at 1124 (citing Scott, 550 U.S. at 383, 127 S.Ct. 1769). However, we must evaluate the reasonableness of the force used “from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.” Graham, 490 U.S. at 396, 109 S.Ct. 1865. “Not every push or shove, even if it may later seem unnecessary in the peace of a judge’s chambers, violates the Fourth Amendment.” Id. (citation omitted).
Our excessive force analysis under Graham involves three steps. “First, we must assess the severity of the intrusion on the individual’s Fourth Amendment rights by evaluating the type and amount of force inflicted.” Glenn v. Washington Cty., 673 F.3d 864, 871 (9th Cir.2011) (citation omitted). “Second, we evaluate the government’s interest in the use of force.” Id. “Finally, we balance the gravity of the intrusion on the individual against the government’s need for that intrusion.” Id. (citation omitted).
1. The Nature and Quality of the Intrusion
In evaluating the severity of' the intrusion on the plaintiff s Fourth Amendment rights, we evaluate both “the type and amount of force inflicted.” Miller v. Clark Cty., 340 F.3d 959, 964 (9th Cir.2003); see also Headwaters Forest Def. v. Cty. of Humboldt, 240 F.3d 1185, 1198 (9th Cir.2000), vacated and remanded on other grounds sub nom. Cty. of Humboldt v. Headwaters Forest Def., 534 U.S. 801, 122 S.Ct. 24, 151 L.Ed.2d 1 (2001) (“[T]he fact finder [must] evaluate ‘the type and amount' of force inflicted.’ ” (quoting Chew, 27 F.3d at 1440)). We have repeatedly held that deploying a police dog to effectuate an arrest is a “severe” use of force. See Smith v. City of Hemet, 394 F.3d 689, 701-02 (9th Cir.2005) (en banc) (noting that use of a police dog is “the most severe force authorized short of deadly force”); Chew, 27 F.3d at 1441 (holding that the use of a police dog was a “severe” use of force); see also Miller, 340 F.3d at 964 (concluding that use of a police dog was a “serious” intrusion on the plaintiffs Fourth Amendment interests).
Notwithstanding our precedents, the district court found the force used against Lowry to be “moderate,” because Bak’s encounter with Lowry was “very quick” and because Lowry’s injuries were “slight.” In coming to its conclusion, the district court distinguished our decision in Chew, emphasizing that, in that case, the police dog bit the plaintiff several times, dragged him between four and ten feet, and nearly severed his arm. Chew, 27 F.3d at 1435, 1441. By contrast, the. dis *848 trict court noted, "Lowry’s struggle with Bak was of “limited duration” and her injuries were relatively minor.
By focusing solely on the amount of force used against Lowry, the district court overlooked a critical component of our inquiry under Graham’s first-step. Namely, the district court failed to consider the type of force employed. Our precedents, as well as the Supreme Court’s, make clear that, in evaluating the severity of the intrusion on a plaintiff’s Fourth Amendment rights, we must assess not only - the amount of force used (and the severity of the resulting injury), but also type of force used and the potential harm it may cause. See Miller, 340 F.3d at 964 (“[W]e assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and the amount of force inflicted.” (emphasis added)); see also Scott, 550 U.S. at 383, 127 S.Ct. 1769 (“[I]n judging whether [Deputy] Scott’s actions were reasonable, we must consider the risk of bodily harm that Scott’s actions posed to respondent in light of the threat to the public that Scott was tiying to eliminate.” (emphasis added)); Glenn, 673 F.3d at 871-72 (holding that the use of a beanbag shotgun is “permissible onlywhen a strong governmental interest compels the employment of such force” in “light of this weapon’s dangerous capabilities ” (citation omitted) (emphasis added)); Chew, 27 F.3d at 1441 (concluding that the force used was severe both because of the nature of injuries sustained and because the dog was trained to repeatedly bite a suspect if he or she resisted and because of the undisputed testimony that the dog’s bites “caydd be fatal” (emphasis added)).
To put it differently, looking solely to the actual consequences of the force used rather than the risk inherent in the use of that type of force accommodates one of the two purposes of § 1983 but wholly ignores the other. Those two purposes are compensation and deterrence. Chaudhry v. City of L.A., 751 F.3d 1096, 1103 (9th Cir.2014) (citing Robertson v. Wegmann, 436 U.S. 584, 599, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978)). For example, if a police officer fires a gun at a fleeing misdemeanor suspect but the bullet only grazes the suspect’s leg, we would not dismiss the force as non-severe because the bullet did not do the damage that it foreseeably could have done. See Robinson v. Solano Cnty., 278 F.3d 1007, 1014 (9th Cir.2002) (holding that police officers’ pointing their guns at close range at a suspect was excessive force even though they did not fire the gun). Likewise, in this case we must not rely on the plaintiffs “luck” that' she only ended up bleeding profusely from a cut lip rather than having her whole face “ripped off’ to excuse the conduct that the officer himself recognized could wéll have resulted in a far more egregious injury. Indeed, the officer conducting the search stated that he “just can’t believe [that] the only damage”' was Lowry’s gash on her lip; as he put it, she was “very lucky.” Whether or not the plaintiff in the case ended up being lucky, a fundamental purpose of § 1983 is to deter the use of unreasonable force in the future in order to avoid what could be much more serious harm to the next person. '
When we consider both the type and the amount of forcé used against Lowry and draw all inferences in her favor, we have little trouble concluding that the intrusion on Lowry’s Fourth Amendment rights was severe. Indeed, this case mirrors Chew in several material respects: just as the defendants in Chew admitted that the dog’s bites “could be fatal,” 27 F.3d at 1441, here, -Sergeant Nulton stated that Bak “could have ripped [Lowry’s] face off.” And, just like the dog in Chew, Bak was trained to bite the first person she saw and maintain the bite until ordered by an offi *849 cer to release. Moreover, the particular facts of this case'magnified the-'threat that Bak posed to Lowry: as Sergeant Nulton admitted, Bak was not trained to differentiate between “a young child asleep or ... a burglar' standing in the kitchen with a butcher knife,” and would simply bite the first person she’found. Furthermore, a reasonable juror could find that by allowing Bak to enter Suite 201 before him off léad, and by failing to keep track of Bak’s precise location while searching the suite, Sergeant Nulton increased the likelihood that Bak would bite and seriously injure Lowry before being called off. ,
Under these circumstances, a reasonable juror could conclude that releasing Bak into the suite posed a high risk of severe harm to any .individual present. Accordingly, for purposes of summary judgment, this factor weighs in favor, of a finding that Lowry’s constitutional rights were violated.
2. The City’s Countervailing Interests
Graham’s second step requires us to examine , the importance and legitimacy of the City’s countervailing interests. Miller, 340 F.3d at 964. This determination is guided by three factors: “(1) the severity of the . crime at issue,. (2) whether the suspect-posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.” Id. (citing Graham, 490 U.S. at 396, 109 S.Ct. 1865). These factors are not exclusive; instead, we must “examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in Graham.” Glenn, 673 F.3d at 872 (citations omitted).
a. Lowry Did Not Pose a Threat to the Officers or Others
We begin our evaluation of. the City’s interest in deploying Bak off lead by analyzing the “most important single element of the three specified factors: whether the suspect pose[d] an immediate threat to the safety of the officers or others.” Smith, 394 F.3d at 702 (quoting Chew, 27 F.3d at 1441). “A simple statement by an officer that he fears for his safety or the safety of others is not enough;. there must be. objective factors to justify such a concern.” Deorle v. Rutherford, 272 F.3d 1272, 1281 (9th Cir.2001)., Á reasonable jury could find that any belief on the officers’ part that they faced an immediate threat when they released Bak was unjustified. See Torres, 648 F.3d at 1126 (holding ffiat there was a.genuine dispute of material fact whether an officer correctly evaluated the dangerousness of the situation when deciding to use force). .Thus, viewing the evidence in the light most favorable to Lowry, the City has failed to show that there are np questions of fact precluding summary judgment in its favor.
Our case law helps guide this determination. In Chew, we held that “a rational jury could easily find that Chew posed no immediate safety threat to anyone.” 27 F.3d at 1442 '(emphasis oinitted). Chew had been stopped for a traffic violation and then fled on. foot and hid in a scrapyard. Id. at 1436. However, there was no evidence that Chew had “éngaged in any threatening behavior during this time, or that he did anything other than hide quietly.” Id. at 1441. Accordingly, we concluded that the “record d[id]. not reveal an articulable basis for believing that Chew was armed or that he posed an immediate threat to anyone’s safety.” Id.
By contrast, in Miller, we held that the plaintiff “posed an immediate threat to [the] officers’ safety.” Miller, 340 F.3d at *850 965-66. There, the officer was chasing a felony suspect who (1) was wanted for fleeing from the police by driving a car with “a wanton or willful disregard for the lives ... of others,” (2) had possessed a large knife only moments earlier,' (3) might have had mental health problems, (4) had ignored an officer’s warning that' he was about to release a dog, and (5) was familiar with the woods where he was hiding in the dark and might have been planning an ambush. Id. at 965 (citation omitted). Under these circumstances, we ’concluded that the officer was “entitled tó assume that Miller posed an immediate threat” to their safety. Id.
Applying these precedents, we conclude that a reasonable jury could find that the officers would not have been justified in believing that Lowry posed a threat to their safety or to" others’. Throughout the entire encounter, until she was bitten by Bak, Lowry remained fast asleep oh the couch. Much like the plaintiff in Chew, Lowry did not “engage[ ] in any threatening behavior,” nor do “anything other than [he] quietly.” 27 F.3d at 1441. And, unlike the plaintiff in Miller, the officers in this case had no reason to believe that Lowry was armed, dangerous, or, intent on inflicting harm. 340 F.3d at 965. In short, “[t]he record does not reveal an articulable basis for believing that [Lowry] was armed or that [s]he posed an immediate threat to anyone’s safety.” Chew, 27 F.3d at 1441.[4]
The district court found otherwise, reasoning that the “officers reasonably and objectively feared for their own safety and any possible hostage’s safety,” because they were searching for a “burglary suspect ... at night,” because they “did not know whether the suspect was armed,” and because the door to DGP’s suite was “ajar, but no lights were on inside.”[5]
A reasonable jury could easily disagree with this portrayal. The district court’s reasoning assumes that any person inside an office building where a security alarm has been tripped at night necessarily poses an immediate threat to their safety or that of others. We find this assumption unwarranted.[6] These facts, standing alone, do *851 not provide an “articulable basis for believing that” the occupant is “armed or that [she or] he posed an immediate threat to anyone’s safety.” Chew, 27 F.3d at 1441.
In sum, we conclude that taking the facts in the light most favorable Lowry, a reasonable juror could conclude that the “objective factors” did not suggest that Lowry posed a threat to the safety of the officers or others. Deorle, 272 F.3d at 1281. Accordingly, for the purposes of summary judgment, this factor weighs against a finding that the City’s interest rendered its use of force objectively reasonable.
b. Lowry Did Not Resist or Attempt . to Evade Arrest
Similarly, the third Graham factor — whether Lowry “actively resisted] arrest or .attempted] to evade arrest by flight,” Graham, 490 U.S. at 396, 109 S.Ct. 1865 — weighs against finding that the City’s use of force was objectively reasonable. It is undisputed that Lowry did not physically resist arrest, “did not attack the officers” or anyone else, and did not attempt to flee from the officers. Smith, 394 F.3d at 703. Nonetheless, the district court found that this factor weighed slightly in the City’s favor, reasoning that the officers could have construed Lowry’s failure to respond to Sergeant Nulton’s commands to exit the suite as an attempt to evade arrest.
But a reasonable jury would not necessarily be compelled to draw such an inference. The mere failure to respond to an officer’s orders, without more, generally does not support'the use of serious force— especially "if the plaintiff has not heard the commands. We concluded as much .in Glenn, where we found that the plaintiffs failure to follow an officer’s instructions to drop a pocketknife did not warrant the officers’ use of a beanbag shotgun, because it was “not clear [that the suspect] heard or understood those orders.” 673 F.3d at 875. Indeed, even in cases where a plaintiff hears, and ignores, police warnings, we have found serious uses of force unjustified. As we described in Glenn, . .
In Dearie, the plaintiff “brandish[ed] a hatchet” and a crossbow and was verbally abusive to officers, threatening to “kick [their] ass.” He also continually roamed about his property despite officers’ orders. Nonetheless, we did not consider this sufficient active resistance to warrant use of the beanbag shotgun— Similarly, in Smith, we held that the plaintiffs refusal to obey officers’ commands to remove his hands from his pockets to show police whether he was armed, as well as his entry into his home despite officers’ orders and his brief physical resistance were “not ... particularly bellicose.”
Id. (alterations in original) (citations omitted); see also Bryan v. MacPherson, 630 F.3d 805, 830 (9th Cir.2010) (“The only resistance Officer MacPherson testified to was a failure to comply with his order that Bryan remain in his car..,. As in Smith, Bryan’s ‘resistance’ was'not ‘particularly bellicose.’ ”). In short, where, as here, the “crux of the resistance [is] the refusal to follow officer’s commands, rather than actively attacking or threatening officers or others,” the government has little interest in using serious force. Glenn, 673 F.3d at 875.
Accordingly, for the purposes of summary judgment, we conclude that this factor weighs against a finding that the City’s interest rendered its use of force objectively reasonable.
c. The Severity of the Crime at Issue
Turning to the final Graham factor, we conclude that the severity of the crime at issue — burglary—-weighs only slightly in the City’s favor. Burglary is *852 not an inherently dangerous crime.[7] Although burglaries can be dangerous, see Sykes v. United States, 564 U.S. 1, 131 S.Ct. 2267, 2273, 180 L.Ed.2d 60 (2011), overruled on other grounds by Johnson v. United States, — U.S. -, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015), the Supreme Court has explicitly held that “the fact that an unarmed suspect has broken into a dwelling.at night does not automatically mean ,[s]he is physically dangerous.” Tennessee v. Garner, 471 U.S. 1, 21, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Indeed, as the Supreme Court noted in Gamer, the FBI classifies burglary as a “property” rather than a “violent” crime,[8] id., and a recent study by the Bureau of Justice Statistics concluded that only about seven, percent of burglaries nationwide involved incidents of violence. Bureau of Justice Statistics, National Crime Victimization Survey: Victimization During Household Burglaries 1 (September 2010), http://www.bjs.gov/ contentypub/pdf/vdhb.pdf.
Once again,, the district court came to the opposite conclusion, holding that, under United States v. Alcala-Sanchez, 666 F.3d 571, 573 (9th Cir.2012), burglary is an “aggravated felony.” Because the officers were investigating a felony, the district court reasoned, this factor “weighs solidly in favor of the government.” ..
We disagree with this conclusion for two reasons. First, it misstates the law. In Alcala-Sanchez, we held that burglary under California P$nal Code § 459 is an “aggravated felony” as that term is defined under' the U.S. Sentencing Guidelines. See 666 F.3d at 573. However, under California law, burglary of úninhabited premises — like an office building — is second degree burglary, a crime that may be punished either as a felony or as a misdemeanor. See Cal.Penal Code §§ 460, 461; People v. Williams, 49 Cal.4th 405, 111 Cal.Rptr.3d 589, 233 P.3d 1000, 1042 n. 6 (2010). Accordingly, the government’s interest in investigating a burglary of an office building is not as strong as the district ■ court’s reasoning suggests. See Bryan, 630 F.3d at 829 (“[T]here was no substantial government interest in using significant force to effect [plaintiff’s][1] arrest for ... misdemeanor violations.”).
Second, even if the officers were investigating a felony, this label is not dispositive. Although the government’s interest in apprehending criminal suspects is certainly stronger when the suspect is suspected of having committed a felony, see Miller, 340 F.3d at 964, we have noted that “[a] wide variety of crimes; many of them nonviolent, are classified as felonies,” Chew, 27 F.3d at 1442. As the Supreme Court has recognized,
[Wlhile in earlier times the gulf between the felonies and the minor offenses was broad and deep, today the distinction is minor and often arbitrary. Many crimes classified as misdemeanors, or nonexistent, at common law are now felonies .... [T]he assumption that a ‘felon’ *853 is more dangerous than a misdemeanant [is therefore] untenable.
Garner, 471 U.S. at 14, 105 S.Ct. 1694 (citations omitted). As set forth above, a non-residential burglary is not an inherently dangerous crime, and “the fact that an unarmed suspect has broken into a dwelling at night does not automatically mean [s]he is physically dangerous.” Id. at 21, 105 S.Ct. 1694.
Accordingly, we conclude that this factor weighs only slightly in favor of finding that the . City’s countervailing interest rendered its use of force objectively reasonable.
d. Other Factors
As noted above, the foregoing Graham factors are not exclusive, and, in evaluating the importance and legitimacy of the City’s interest in using force, we must “examine the totality of the circumstances and consider whatever specific factors may be. appropriate in a particular case, whether or not listed in Graham.” Glenn, 673 F.3d at 872 (citation omitted).
One such additional factor is whether or not a warning was given before force was used. See Nelson v. City of Davis, 685 F.3d 867, 882 (9th Cir.2012) (“[W]e have held that ‘the giving of a warning or the failure to do so is a factor to be considered in applying the Graham balancing test.’” (quoting Deorle, 272 F.3d at 1284)). Here, we agree with the district court’s conclusion that Sergeant Nulton’s warnings prior to releasing Bak weighs in favor of finding that the government’s use of force was reasonable. See Forrester v. City of San Diego, 25 F.3d 804, 808 (9th Cir.1994) (holding that use of force was not unreasonable, in part because protesters were given warning and instructions on how to comply before force was applied).-
However, the fact that Lowry did not hear these warnings has some bearing on the weight we accord this factor. For example, in Nelson, we held that, even though the officers gave warnings before shooting pepperball guns, the fact that the orders could not be heard over the din of the crowd weighed against a finding that the use of force was reasonable. 685 F.3d at 882-83. Accordingly, even though we conclude that this factor weighs in favor of the government, we find that it does so only slightly.
Another factor pertinent to this case is the availability of other tactics to effect the search.[9] See Bryan, 630 F.3d at 831 (noting that, in evaluating whether a use of force was reasonable, “we have held that police are required to consider what other tactics if any were available to effect the arrest”) (citations and brackets omitted); see also Smith, 394 F.3d at 701 (explaining that police must consider less intrusive alternatives). While officers “are not required to use the* least intrusive degree of force possible,” Forrester, 25 F.3d at 807, the availability of “clear, reasonable and less intrusive alternatives” to the force employed “militate[s] against finding [the] use of force reasonable,” Bryan, 630 F.3d at 831. Here, taking;the evidence in the light most favorable to Lowry, a reasonable jury could find that Sergeant Nulton had at least one alternative available: namely, he could have kept Bak on lead, a tactic that.would:have allowed him to exercise greater control over Bak. Indeed, the SDPD’s Operation Manual for its Canine Unit requires officers to keep police dogs on lead during residential searches, “unless the handler can reasonably determine there are no residents or animals in the home.” For the purposes of summary *854 judgment, the availability of this alternative tactic weighs slightly against a finding that the City’s use of force was objectively reasonable.[10]
3. Weighing the Conflicting Interests
Whether deploying Bak in this case was “objectively reasonable” turns on “whether the degree of force used was necessary, in other words, whether the degree of force used was warranted by the governmental interests at stake.” Deorle, 272 F.3d at 1282 (citing Graham, 490 U.S. at 396, 109 S.Ct. 1865). “To put it in terms of the test we apply: the degree of force used by [the police] is permissible only when a strong government interest compels the employment of such force.” Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1057 (9th Cir.2003) (quoting Deorle, 272 F.3d at 1280 (alterations and emphasis in original)).
Here, when responding to an alarm at an office building at night, police officers encountered an open door to an office, announced their presence, and received no reply. The question on appeal is whether a reasonable jury could find that under these circumstances the officers used excessive force when they deliberately unleashed a police dog that they knew might well “rip[ ] [the] face off’ any individual who might be present in the office. As the preceding discussion makes plain, a reasonable jury could find that the City’s use of force in this case was not an objectively reasonable one. The intrusion on Lowry’s liberty interests was severe. By contrast, taking the evidence in the light most favorable to Lowry, a reasonable jury could find, that the City had little interest in deploying such a serious use of force: three of the five factors used to assess the City’s interests — including the most important factor, the absence of any immediate threat to the safety of the officers or any other person — weigh against a finding that its use of force was objectively reasonable, while the other two weigh only slightly in the City’s favor. Accordingly, a reasonable jury could find that the deployment of Bak was not an objectively reasonable use of force. See Torres, 648 F.3d at 1126. Because the City has failed to show that there are no questions of fact as to whether the use of force was reasonable, see Espinosa v. City & Cty. of S.F., 598 F.3d 528, 538 (9th Cir.2010), summary judgment for the City was not warranted.
B. The City’s Liability
We now turn to the second prong of the Monell inquiry: whether the City can be held responsible for Lowry’s constitutional injury. Chew, 27 F.3d at 1439. Municipalities may not be held vicariously liable for the unconstitutional acts of their employees under the theory of respondeat superior. See Monell, 436 U.S. at 690-91, 98 S.Ct. 2018. Rather, in-order to prevail on a § 1983 claim against a city, a plaintiff must prove that the constitutional injury was inflicted pursuant to city policy, regulation, custom, or usage. Id.; see also Chew, 27 F.3d at 1444, “City policy ‘causes’ an injury where it is ‘the moving force’ behind the constitutional violation, or where ‘the city itself is the wrongdoer.’ ” Id. at 1444 (quoting Monell, 436 U.S. at 694, 98 S.Ct. 2018, Collins v. City of Harker Heights, Tex., 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). However, “City policy need only cause the constitutional violation; it need not be unconstitutional per se.” Chew, 27 F.3d at 1444 (citation and brackets omitted).
Here, there is no dispute that the City’s bite-and-hold policy was the “mov *855 ing force” behind Lowry’s constitutional injury. The City admitted as much in its Amended Answer to Lowry’s First Amended Complaint, stating that:
at approximately 11:00 p.m. on February 11, 2010 Lowry was lawfully sleeping on the couch in her unlocked office suite located at 4603 Mission Blvd., Suite 200, San Diego, California when Sergeant Bill Nulton deployed a police services dog in conformity with the official policies and procedures adopted by the San Diego Police Department and Plaintiff was bitten or scratched on her upper lip.
Because the City concedes that Sergeant Nulton released Bak in conformity with the SDPD’s official policies and procedures, we conclude that the City’s policy was the “moving force” behind Lowry’s injury. See Chew, 27 F.3d at 1444-45 (“There is little doubt that a trier of fact could find that Chew’s injury was caused by city policy ... [because] [i]n the district court, the city conceded ... that departmental policy authorized seizure of all concealed suspects — resistant or nonresistánt, armed or unarmed, violent or nonviolent— by dogs trained to bite hard and hold.” (emphasis omitted)).
The City raises several unavailing arguments as to why it is entitled to summary judgment on the issue of municipal liability. First, it argues that Lowry’s' single incident provides an insufficient basis for her Monell claim, citing to our decision in Trevino v. Gates, 99 F.3d 911, 918 (9th Cir.1996). Trevino, however, is inapposite. There, we held that “[Ijiability for improper custom may not be predicated on isolated or sporadic incidents.” Id. (emphasis added). Here, Lowry’s claim is predicated not on custom, but on an official municipal policy.
Second, the City argues that, in order to prevail on a Monell claim, Lowry must prove that the City’s policy amounts' to deliberate indifference of her constitutional right, relying on our decision in Oviatt ex rel. Waugh v. Pearce, 954 F.2d 1470, 1477-78 (9th Cir.1992). Once again, the City relies on an inapplicable part of our Mo-nell jurisprudence: the “deliberate indifference” requirement applies only to claims involving allegations of constitutional deprivations resulting from governmental inaction or omission,- such as a failure to adequately train. See id, at 1474 (“[A] local governmental body may be liable if it has á policy of inaction and such inaction amounts to a failure to protect constitutional rights.”). Because- Lowry claims her constitutional' deprivation resulted from a City policy and affirmative government conduct — training Bak to “bite and hold” and releasing Bak off-lead into Suite 201 — the “deliberate indifference” analysis does not apply.
Finally, the City argues that because there is no case law indicating that a bite- and-hold policy is unconstitutional, it cannot be held liable for Lowry’s injuries. The City appears to argue that it is entitled, to qualified immunity because there was no “clearly established” law holding its bite-and-hold policy unconstitutional.
The City is mistaken for two reasons. First, qualified immunity analysis is irrelevant to the issue of Monell liability. See Brandon v. Holt, 469 U.S. 464, 471, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985) (“[A] municipality is not entitled to the shield of qualified immunity from liability under § 1983.”). Second, establishing municipal liability does not require Lowry to demonstrate that the City’s policy is “unconstitutional per se;” rather, she need only demonstrate that the policy was the “moving force” behind her constitutional injury. Chew, 27 F.3d at 1444.
Because the City conceded .before the district court that Lowry’s injuries were incurred “in conformity with the official policies and procedures adopted by the *856 San Diego Police Department,” we conclude that the district court erred in granting summary judgment in the City’s favor on the issue of municipal liability. ,
IV.
As noted above, the Supreme Court has said that the objective reasonableness of an officer’s actions in the excessive force context is a “pure question of law” only once “the relevant set of facts” has been determined. See Scott, 550 U.S. at 381 n. 8, 127 S.Ct. 1769; see also id. at 386, 127 S.Ct. 1769 (“The car chase that respondent initiated ... posed a substantial and immediate risk of serious physical injury to others; no reasonable jury could conclude otherwise.”). Our case law following Scott has noted that “[b]ecause the reasonableness standard ‘nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment ... in excessive force cases should be granted sparingly.’ ” Torres, 648 F.3d at 1125 (quoting Santos v. Gates, 287 F.3d 846, 853 (9th Cir.2002)). In Torres, for example, the question was whether a police officer’s mistake of pulling out and firing her gun rather than her taser was “objectively unreasonable under the totality of the circumstances,” including the exigencies of the situation and hey past training on where each weapon was holstered. Id. at 1124. In that case, the district court discounted the officer’s previous training and found that her accidental shooting was the result of an action that she was forced to take in a tense situation. Id. at 1125. We reversed, holding that a reasonable jury “could weigh the significance of [the officer’s] risk awareness and daily practice differently from the way in which the district court weighed those factors” and could find that, rather than a tense situation forcing the officer to act, the officer’s “poor judgment and lack of preparedness caused her to act with undue haste.” Id. at 1125-26. In other words, we reversed because a reasonable juror could have made different factual inferences than the district court.
Similarly, the district court here gave one interpretation regarding how to weigh the different factors at issue. It found that the officers faced a tense situation, unsure 'of who was behind an open office door in a dark office building, and that they cautiously used a police dog to apprehend a potential burglar and then quickly called back the dog when they realized Lowry was not a threat. Lowry v. City of San Diego, 2013 WL 2396062, at *5-*6 (S.D.Cal. May 31, 2013). As in Torres, however, a reasonable juror could make wholly different factual inferences: the officers, responding to a routine alarm and not faced with a burglar who already had engaged in threatening behavior, or who had attempted to evade arrest, or who had committed an inherently dangerous crime, unleashed a police dog that the officers believed was likely to rip a person’s face off, even if she were an innocent employee of a business who had fallen asleep in her office late at night. It is the jury’s role to decide which of these or other inferences should be drawn from the facts in the record. The City has thus failed to show that there are no questions of fact as to whether its use of force was reasonable. See Espinosa, 598 F.3d at 538. Given that there is no dispute that the City’s “bite and hold policy”, was the moving force behind Lowry’s constitutional injuries, the City was not entitled to summary judgment. . We reverse and remand this case for further proceedings.
REVERSED and REMANDED.

. Lowry contends that a genuine issue of material fact exists as to whether the door leading to Suite 201 was open. Specifically, she argues that the officers’ assertion that the door was open is contradicted by her deposition testimony that the door "automatically closes.” The district court ruled Lowry’s testimony inadmissible, finding that Lowry failed to offer "firsthand testimony.” Accordingly; the district court «ruled that there was no dispute that the door was.open.
We reverse evidentiary rulings made in the context of summary judgments only if they are "both manifestly erroneous and prejudicial.” Bias v. Moynihan, 508 F.3d 1212, 1224 (9th Cir.2007) (citations omitted). As explained below, even assuming that the door to Suite 201 was open, a reasonable jury could find that deploying Bak was not an objectively reasonable use of force. Accordingly, because the district court’s ruling was not prejudicial, we need not rule on it.

. Lowry contends that there is a material issue of fact regarding the level of illumination inside Suite 201 at the time the officers entered. Specifically, she relies on the testimony of Drew George (the CEO of DGP), who testified that the balcony is typically "pretty light.” However, George offered no téstimo-ny as to how well-lit the interior of Suite 201 was on the night of the incident, and Lowry herself testified that, on that night, Suite 201 was dark. Accordingly, we conclude that Lowry has not raised a genuine issue of material fact regarding the degree of illumination inside Suite 201.

.Lowry contends that there is an issue of material fact as to whether Sergeant. Nulton gave these warnings. Specifically, she argues that the officers’ testimony is contradicted by her own testimony that she did not hear Sergeant Nulton’s warnings. The district court ruled Lowry’s testimony on this point inadmissible, finding that she lacked foundation to testify' as’ to whether Sergeant Nulton gave warnings because she was sleeping. Therefore, the district court ruled that it was undisputed that Sergeant Nulton gave these warnings.
As explained below, even assuming that Sergeant Nulton shouted warnings' that he was about to release a police dog, a reasonable jury could find that deploying Bak was ■ not an objectively reasonable use of force. Accordingly, because the district court’s ruling was not prejudicial, we need not rule on it. See Bias, 508 F.3d at 1224.

. The City attempts to distinguish Chew by arguing that, unlike Sergeant Nulton, the officer in Chew made physical contact with Chew before releasing the police dog. According to the City, the officer's contact with Chew gave him an opportunity to eliminate the possibility that Chew was armed — a luxury not afforded to Sergeant Nulton.
■' Not so. In Chew, we specifically noted that ",[t]he officer [did] not search[] [Chew] for weapons” before he fled. 27 F.3d at 1436. More to the point, our conclusion that Chew did not pose a threat to the safety of the officers,or others was grounded in our determination that the record as a whole ."did not reveal an articulable basis for believing that Chew” presented such a threat. Id. at 144Í. Likewise, as explained above, nothing in the record here provides an articulable basis for believing that Lowry posed a threat to the safety of the officers or others.

. Similarly, the City argues that, under our decision in Frunz v. City of Tacoma, officers responding to a "burglary in process” are entitled to "assume that the suspects will, if confronted, flee or offer armed resistance.” 468 F.3d 1141, 1145 (9th Cir.2006) However, Frunz did not address whether the officers' • use of force was reasonable. Id., at 1144. Instead, that case considered only whether the officers’ warrantless entry into a home was justified. Id, at 1144. Accordingly, Frunz has little relevance to our current inquiry.

.Indeed, this assumption is particularly suspect in light of the fact that the vast majority of burglar alarm calls are false. See San Biego County Grand Jury, No 'Cost’ For Alarm? 1 (June 1, 2011), http://www, sandiegocounty.gov/content/dam/sdc/ grandjury/reports/2010-2011/AlarmsFinal Report.pdf (concluding that "95% or more of all police alarm calls” received by the SBPB are false).

. The City takes issue with this conclusion, arguing that all burglaries are dangerous. In support of its contention, the City relies, once again, on our statement in Frunz that officers may assume that "normal[]” burglary suspects will, "if confronted, flee or offer armed resistance." 468 F.3d at 1145. However, as explained aboye, see supra note 5, Frunz did not address whether the officers’ use of force in that case was'reasonable. Id. at 1144. Accordingly, it has little bearing on the instant case, :

. Although Gamer was decided in 1985, the FBI continues to classify burglary as a “property” rather than a "violent” crime. See Federal Bureau of Investigation, Uniform Crime Reports, Crime in the United States 2013, https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/ property-crime/property-crime-topic-page/ properfycrimemain_final. •

. Although most of the case law in this area has been developed in the context of an arrest, i.e., a constitutional "seizure,” that law applies equally in the search context. If any- - thing,- the justification for using force in a • search is even less -than in making an arrest.

. Although not developed in this record, it may also be that the officers could have visually scanned the suite with night-vision goggles before sending in the police dog off lead.

. Alternatively, the majority opinion appears to invite you to walk away and disregard the burglar alarm and the propped door, because most alarms are false, anyway. See majority opinion, at 850-51 n. 6.1 wonder whether the ■majority opinion intends that police should simply not bother with responding to any alarms. I doubt that’s what citizens expect.